Mike Truesdale on behalf of Zitronix Corporation The summary judgment in this case should be reversed because it constitutes error. There was evidence within the record from which the jury could conclude both that KLA committed fraud in the pursuit and the prosecution of the 260 patent and that the examiner relied upon the fraud in issuing the patent that caused the Walker process claims that we are asserting. In my time before the Court, what I'd like to talk about is what constituted the commission of the fraud, both in terms of the failure to disclose the absence of a good-faith basis to continue the prosecution of the patent after the 441 judgment was rendered, and then talk about the causal effect, the but-for element of the claim that was rendered after the entry of the patent. Before you get to the merits, the jurisdiction issue needs a minute or two. Sure. Is it your view that if Gunn didn't exist, the Federal Circuit would clearly feel it jurisdiction? I can't say that. I thought that, but I can't say that. And the reason I can't say that is the Court's opinion on transferring the case to this Court talked about the substantiality of the question that is presented under Colt v. Christensen. Right. And I don't think Gunn was an example. But in terms of substantiality, I mean, this may be right according to what you're arguing to us. We have to compare patents here. And were we to accept there was fraud on the PTO, the patent would then be invalid. And what could be more substantial than ascertaining whether something rises to fraud against the PTO? This is not a patent case. And the question — this is not a patent case. It's an antitrust case. And that's the distinction here. But the antitrust case would determine the validity of the patent. It's not a question of the validity of the patent. The question is whether the patent was procured by fraud. Exactly. And if it were procured by fraud, it would be — it would not be a patent. It would be invalid. That's how you determine the merit of the patent. What we're determining at this point is whether the patent was procured by fraud such that it gave rise to antitrust damages. Right. But what Walker process case anywhere ever, freestanding no other theories, has ever been decided in the circuit other than the Federal Circuit? Well, I'm not aware of any that were freestanding. Okay. Well, that's what we have here. But the point is, is that the — I agree. And, again, we briefed — we brought the case to the Federal Circuit. Both of you accepted jurisdiction. We accepted jurisdiction. We argued — there are a few things in this case where we have agreed on matters. And our — one position we agreed on was our assumption that the Federal Circuit had jurisdiction. Exclusive jurisdiction. Exclusive jurisdiction. The court — Last question on that. It's a pickle, but it's a very important issue. Well — If we were to transfer it back, even with the 10-2 en banc vote, what would happen? Well, I think that the — we would be in the exact same scenario that gave rise to the Colt v. Christensen opinion. Yes. Because that was the case being — Yes. — percolating back and forth. And the Supreme Court ultimately said that if there is a plausible statement, plausible basis for a transfer, that ends the inquiry. And you think there is a plausible one? It is plausible under what the court said to assert that the question before this court with respect to fraud is a run-of-the-mind question of fraud. Did they — did they commit a — make a misstatement? And whether it has patent consequences is a separate question, Your Honor. And that's — Okay. Last thing I'll say. The only way — and then we'll let you get to the merits. The only way we can say it was fraud is if we compare the prior art, which sounds very much to me — no? Well, I don't think that's necessary in this case. Again, and I'm going back to the point that I'm making about this not being a patent case. I know. Okay? The patent claims are identical in both cases, and that is — that is a starting point. Okay? It is a starting point. We have laid out the patent claims. The summary judgment motion never argued that there were different patent claims. They presumed that they were the same and that they didn't have a duty to do anything. The only time, Your Honor, in the appellate — or in the summary judgment briefing, that the question of — Well, you say they're identical, and they sure look close. That may be a question more for opposing counsel. But one — you know, these are technical, technical terms. Is silicon a distinguishing feature? Is the laser beam a distinguishing feature? Is the wavelength a distinguishing feature? Those are what the Federal Circuit does better than we do. I don't disagree with respect to the expertise of the Federal Circuit. The point here is that the record demonstrates that every distinction that was even conceived of presupposed that the patents were identical. The difference between a wavelength and a fixed wavelength, for example. We can talk about the merits of that. But the prior art all confirmed that the fixed wavelength was always in use. And so — Well, that's not my question. You go ahead with your argument. Well, your question is important. But the point is, is that — and as a matter of fact, that leads me right to where I'm going to start with. And that is that the patent claims were identical. We know that from our pleadings. We know that from the claims comparison chart that show they're identical. The summary judgment motion never differentiated between the claims or presupposed in any way whatsoever that they were not identical. Judge Sparks's ruling, which is what we're on appeal from, presupposed that they're identical. And here's why we know that. There are several reasons we know that. It did presuppose it, but he explicitly said it's not that they were defrauded by Stallman. It's that they just ignore verdicts. They ignore verdicts, and they overrode his judgment. So we're talking about a — That doesn't make a fraud case. Well, it does. And here's why it does. Okay. If the same claim was present in both cases, once you have a 441 judgment, somebody prosecuting a patent has to have a good-faith basis to believe and to assert that the claims that are being prosecuted are patentable. Right. Absent good faith, a party cannot prosecute a patent claim. And once the final judgment was rendered, and once no appeal was taken, KLA lacked any good-faith basis to continue the prosecution of the patent. Well, they couldn't sue another defendant, but they could respond to Mr. Merrill's questions. There's no case that says they can't answer an inquiry from an examiner. No, Your Honor. But there's — what the duty was, the point of the — The duty of disclosure and candor. Duty of candor. Okay. And a duty not to prosecute a patent without a good-faith basis for doing so. And once the 441 judgment was rendered — But if they give the entire underlying — I'm just pressing you. I'm not saying this is how I view it. But if they give the entire case below, the deficiency is at the examiner's level. It isn't that Mr. Stallman can't answer questions Mr. Merrill starts asking him. Well, the problem, the default problem is the fact that they continued to prosecute the 260 patent once they lacked a basis for doing so. Okay. They had a duty of candor to withdraw the prosecution. Well, what's your best case that even though you've disclosed all the contradicting information, the fact that you don't draw his attention equals fraud, which — and I'll make a compound question. What's your best case for that? And if you prevail — I've wondered this for a bit because it is not my area of specialty. If you were to prevail, wouldn't Mr. Stallman then have committed a Federal crime of a false statement to a government officer? So the consequences for Stallman are not just professional. They would even contemplate criminal exposure. Is that correct? I think that that's potentially correct. So I would tell you that the duty of candor — I would refer this Court to Ethicon that's cited in our briefing. I would refer this Court to the case of Beckman, which is a Fifth Circuit case from 1970, which basically says that the duty of candor amounts to — the violation of the duty of candor amounts to the commission of fraud for purposes of making disclosures to a patent office. And so the point that I'm making is that the second that the appellate deadline expired, rendering the 441 patent claim invalid, by law, the failure to take an appeal amounts to a concession in law that the claims in the 441 patent are invalid. And to continue prosecuting the 260 patent at any point after that, KLA had no good faith basis to do so. So they had two options. The day that the appellate deadline expired, they had two options. One is to withdraw the claim, withdraw the 260 claim, because they no longer had a good faith basis to assert it. And the second option would be to explain to the examiner why, in the face of the judgment, they did have a good faith request — basis to assert that, you know, much like any duty of candor before a court. You know, I can — if I rely upon a case, I cite a case, and I know it's been overruled, I can tell a court, I have a good faith basis to believe that there should be an extension of the law or something like that. And that's why the appellate deadline is so important. Because the day that the judgment was rendered — Your argument does assume that we find identicality. Well, for purposes of summary judgment, that's established. And the reason I say it's established is that's what Judge Sparks based the summary judgment ruling on, that they were identical. Okay. And it — is it relevant that Merrill keeps saying no, no, no to them as to the 260, and then he finally says, but now you've persuaded us? Yes. Yes, it is. And let me tell you why. Because the very fact that they're even asking Merrill to make those requests or make those findings after they lost a good faith basis demonstrates the — the continuation of the fraud. And I gave the Court a handout, a demonstrative exhibit, which is a timeline for the — the element of fraud. And what I'd like to demonstrate is that on the very first page, Your Honor, there's a — I'm just going to ask you. You gave this to them today? Yes. Yes, Your Honor. Was this in the record? Have you created it? That's — the first page is — everything that's in there was from the record. Okay? The first page is their timeline that is in their brief. And what we did is we just overlaid the yellow on top of that. Rather than doing that, at least for me, could you tell me Stallman's worst misrepresentation? When he's speaking to Merrill, not the appeal, not the failure to disclose the appeal. What's — what was — because he makes two statements to Merrill at different times. Which do you think is the exact statement that is flat-out wrong? The worst statement is the one that is cited in that exhibit, and that has to do with his misrepresentations about the prior art. Now, he makes — on October 10th, he makes an affirmative representation that he's describing the background of the thermowave. He's describing the background of the wavelengths. And he makes the affirmative statement that, as will be discussed, no prior art discloses these wavelengths. He says, effectively, wavelengths — it became determined that focusing in on the wavelengths increases efficiency. No prior art discloses that. But we know that that is not correct. And we know that that's false because Judge Sparks held it was false. KLA's own witness during the 441 statement said that that's false, that there's no prior art, and that it had been known for 40 years, that a change of the wavelengths was just a design concept, and that it would — fundamentally, it had been known. So it was — Does he reiterate that misstatement in the second round of talks? He never raises — he never refers in the second iteration of comments to Mr. Merrill any comments with respect to the prior art that Judge Sparks ruled upon to determine that the claims were anticipated and obvious. So he misrepresents the universe of prior art. He knows — he knows that Batista and Manzanares and the other prior art that was previously disclosed to the examiner before Judge Sparks ruled that it rendered those claims invalid, but he doesn't tell the examiner after the fact that those examples of prior art rendered the patent claim invalid. Invalid is a matter of law because they didn't appeal Judge Sparks' ruling declaring it such. And so that, to me, is the most telling example of fraud, and we know that but for that fraud, the patent examiner would not have granted the patent because the patent examiner's reason for allowance that's on the last page of the handout that I gave expressly says, Petitioner's argument is accepted. There is no prior art that disclosed these wavelengths. Even though everybody knew since 2010 trial that that was not the case. And so that was fraud that resulted in the rendition of an improper, fraudulent — We have to say Judge Sparks committed clear error when he said, well, Stallman's advocacy was just vigorous and aggressive. He didn't close the loop and say fraud. Judge Sparks' statement about vigorous advocacy, you know, I don't think that you have a right to make an argument when you don't have a good-faith basis for doing that. But I'm just asking you, would we have to say that his description of Stallman's behavior was clear error? Yes. I mean, we're talking about a summary judgment review here, and we're talking about — You say there's an issue of fact as to it. Totally. Totally. Because a juror could certainly find that when Stallman told the examiner what he told the examiner, based upon what he knew, what KLA knew, what Judge Sparks knew, what KLA knew, the rendition of a summary judgment declaring no fact issue, no jury could decide that he committed fraud, that's fundamentally improper. A jury certainly could find that. And a jury could certainly find that the patent examiner relied upon that fraud because the reason for allowance expressly says that he did. He says, claim to, I agree that there is no prior art. Mr. Stallman's argument is persuasive. I accept that. But for that fraud, we would have been able to demonstrate the existence of the issuance of the patent that was otherwise no legal basis to assert it as a matter of law. And I am out of time, but I'll entertain any other questions. We don't have time, Your Honor, but — Thank you, Your Honor. May it please the Court, Aaron Fountain for Appellee KLA-10 Court. In this case, Zitronix's novel fraud theory fails as a matter of law for at least three independent reasons. And the district court's summary judgment of no fraud should be affirmed. Again, of course, could you address jurisdiction first? Is your position that the Federal Circuit does not have exclusive jurisdiction here, or that it's just plausible that it doesn't, and that's because Gunn, you're convinced or you think it's plausible, affects the analysis? What's your — how do you view the jurisdictional issue? Your Honor, I think that the Federal Circuit clearly has exclusive jurisdiction over this case for the reasons that we set forth in our jurisdictional statement in the brief. Yeah. We believe that, to answer Your Honor's earlier question, that absent Gunn, a straightforward application of Christensen, where you have a Walker process fraud claim standing alone with no other claims, clearly falls within the Federal Circuit's exclusive jurisdiction like this case. Well, so you've persuaded me. I mean, it just seems — we've never had a Walker process claim ever since the inception of the Federal Circuit, and no other circuit's ever taken one where it was freestanding. So what you just said is how I look at the law. Given that, it's not even plausible. I agree, Your Honor. I believe that every court has an independent obligation to satisfy itself that it has subject matter jurisdiction. Right. Well, then how do we avoid — was it the Supreme Court that said try to avoid the ping-pong situation? Yeah. How do we avoid transferring it back and them saying we've already had an en banc on this? Your Honor, I think the plausibility question is more of a jurisprudential one than a jurisdictional one.  I believe the correct result under a clear reading of both Christensen and even Gunn, to the extent it applies, where it's looking at the congressionally set up division of labor between the various judicial systems, this case belongs in the Federal Circuit, and I think sending it back would be appropriate. Last question on that. Therefore, do you agree with everything Judge Newman wrote in the dissent? Your Honor, I don't recall everything that she wrote, other than the fact that she agreed with our reading of Christensen and she agreed that Gunn's federal court, state court analysis was inapplicable to this case. That's — we're in a tough spot here. I agree, Your Honor. Jurists are very often called upon to make tough decisions, but what I think an easy decision here is that there was no fraud below. Okay. And if I may, I'd like to explain a little bit more about why. I think it's very important to note that Mr. Stallman stopped the prosecution of the 260 patent after the PTO said the claims are allowable specifically so that the examiner could consider the effect of the final judgment order from the 441 case. That is not fraud. If Zitronix disagreed with the PTO's decision to issue the 260 patent, Zitronix had any number of avenues of relief other than bringing a fraud claim. Zitronix could have gone to the PTO and filed a post-grant review, an inter partes review, or a reexamination asking the PTO to revoke the 260 patent because the decision to issue it was incorrect. Zitronix also could have gone to the district court and brought a declaratory judgment of invalidity seeking a judicial declaration that the 260 patent is invalid. Zitronix did not do that. It has never challenged the validity of the 260 patent by itself. Okay. But that's all sort of a procedural observation about other avenues. But they don't have to choose that over fraud if there's any evidence, genuine disputed fraud. So what would help me would be if you start with what is the patently, well not patently, clearly distinguishing feature between 260 and 441. What is the feature that makes the two different? Mr. Stallman identified a number of features that I'm just asking you what is the significant, most significant one of all the ones Stallman may have pointed to. So I'll answer your Honor's question and then I'd like to explain a little bit about it. My personal belief, which is not in the record anywhere as relevant to any of the questions presented to the Court, is that probably the fixed wavelength limitation would be the most significant difference between the claims. That being said, whether these two claims are identical or not says very, very little, if anything, about whether fraud was committed here. Well, we're not going to get off that that quickly because that's how I looked at the record, too. It is the wavelength, but that is exactly what Judge Sparks and the jury verdict said wasn't a sufficiently distinguishing feature. And I thought that's also why what's the term? Double patenting rejection? Is that what it is? Yes. I'd like to explain a little bit more. Maybe explain both, because did Sparks not say the wavelength was in the prior art? So there are two wavelength issues, one of which was never addressed in the 441 case at all. And whether that ultimately affects the validity of the patent is totally irrelevant. And that is, you can use a fixed wavelength probe beam or there are variable wavelength probe beams, and those are different kinds of lasers. Again, we're kind of going beyond the record here, but as a technical matter, I believe that to be true. The word fixed, the word fixed wavelength was one claim limitation that Mr. Stallman identified as different between the 260 patent claims and the earlier 441 patent claims. The other difference Mr. Stallman identified goes to the wavelength range. It says these claims cover a wavelength range between 360 and I believe 410 nanometers, which relates to the color, UV color of the light being used as the probe beam. In the 260 patent, that range is five nanometers different than the range that was in the 441. What's the difference? Nanometers. Nanometers. And that refers to the length of the light beams coming out of the laser. So in the prior opinion, the district court addressed the wavelength range, but this idea of a fixed wavelength probe beam was not before the jury or the court in the 441 litigation because— Mr. Stallman draws that to Merrill's attention or not? Anywhere in the record. I don't believe that Mr. Stallman specifically pointed Merrill to that fact, but here's what we do know. We know that the examiner compared the claims of the 441 patent to the claims of the 260 patent. We know that because the examiner issued an obviousness type double patenting rejection, and what that rejection is is a conclusion by the examiner that I think—I, the examiner, think these two claims are very close, but they're not identical because if the claims were identical, the examiner would issue what's called a statutory double patenting rejection, which comes out under 35 U.S.C. 101. That's a conclusion. These two claims are identical. You're only allowed one set of claims, so the second set, I'm not going to allow those, and you cannot overcome a statutory double patenting rejection by filing a terminal disclaimer. Right? So Mr. Stallman gets this obviousness double patenting where he knows the examiner has compared the claims side by side and concluded that they're close but not identical, and Mr. Stallman responded in the way that every patent prosecutor does in just about every case. He files a terminal disclaimer because this obviousness type doctrine was created by the courts to really go to patent claim term, which is not an issue at all with respect to the 260 and 441, and the Federal Circuit said in Google v. Simple Error or Simple Error v. Google that the submission of a terminal disclaimer is not an admission by the prosecuting attorney that the claims are patentably indistinct. Right? So the examiner is fully aware of the similarity of the claims of the two patents, and he says, I'm going to issue this obviousness type double patenting rejection, and that happens prior to November 18, 2010. I believe it was in October of that year. Is that before or after the verdict? That was before the verdict. So the verdict to me, again, you both know this area of law much better, but the verdict to me sort of confirms the decision about the double patenting rejection. So then we get a lapse of a bunch of years, and Mr. Stallman's the continuous entity, and we have a new examiner, and he begins to initiate the 260 again. I'd like to correct Your Honor's reading. Yeah. Okay. Okay. Right? So are you looking at a copy? I wasn't really even looking at that. This is my memory from the briefs and all that. But I guess I just, I come down, it's too simple probably, but I come down to, does Stallman ever tell Merrill two years later, hey, there's a jury verdict here. Judge Sparks made a finding of fact as to these two, and there's the double patenting rejection. Does he ever draw his attention to that? Yes, he does, and I would say it this way, Your Honor. On February 7, 2011, the first examiner allowed the claims over Batista, Manzanares, the OPSL 669 patent, and the Alpern 611 patent, as well as the disclosure of the thermoprobe device itself, which is found in the background section of the 260 patent, and Mr. Stallman's explanation of the jury verdict. The examiner, first examiner, has all of that and allows the claims. And Mr. Stallman says, hold on. Judge Sparks just issued his order in that first case explaining the jury verdict and the prior art that he thinks is relevant. You ought to consider that. And that's where we have the break. That disclosure that is just, the only things that Mr. Stallman submitted were the final judgment, the final judgment order, a couple of Xitronix's JMOL briefs, and one of KLA's JMOL briefs. That's it. It's this very discrete packet. Here's what happened in the first case. The examiner that considered those materials was, in fact, the second examiner. They initialed the information disclosure statement on July 12, 2013. That was Merrill. So Merrill says, I see Judge Sparks' order. I see the final judgment. And now I'm evaluating these claims of the 260 patent, which are not identical, and issues a completely different rejection. The examiner does not go back and say, you know what? I'm persuaded by Manzanares and Batista and Opsal and Alpern. I'm going to go a completely different direction. I'm going to issue a rejection over Rosenzweig, which is a new patent. Opsal, which was not discussed in the first case but was, in fact, disclosed prior to the jury verdict. So those are the primary references for the rejection. And then for the dependent claims, the examiner says, I'm going to add on this Alpern reference and I'm going to add on the Borden reference. None of the prior art that Mr. Truesdale focused on, Batista and Manzanares, persuaded this examiner in any way. And so at the point where Mr. Stallman is faced with that first rejection, which is only over the four references I mentioned, Rosenzweig, Opsal, Alpern, and Borden, what they're saying is, look, a reasonable juror could conclude under a clear and convincing evidentiary standard that Mr. Stallman is lying about two references, Batista and Manzanares, that are not currently issued as a rejection. The patent office has already concluded we're not going to reject the claims over Batista and Manzanares twice. Yet they're saying in the context of that prosecution history, somehow Mr. Stallman is going above and beyond what he needs to do to get the claims allowed, right? All he has to overcome is Rosenzweig, Alpern, Opsal, and Borden. And they're saying, hey, a jury could conclude that he's lying about Batista and Manzanares, which aren't even at issue. That makes absolutely no sense, and that's why we walk through in detail in the brief the full context of what Mr. Stallman said. Can you give me your detailed answer to the misrepresentation he focused on when I asked him what's the most acute misrepresentation? He says the October 10th statement about the prior art and its wavelength disclosure. That's exactly what I'm talking about, Your Honor. What they say is they point to this idea that Mr. Stallman was talking about all the prior art in the world when he says, and if you want to look at the handout that ---- So it's open to the view he's talking about the Thurma item and each of the individuals you've mentioned. Is that it? I'm sorry, Your Honor. I didn't quite get it. You're saying the statement that he quoted could have been limited to the claims that you've just described. Well, I'm going much further than that, Your Honor. I'm saying no reasonable juror could find clear and convincing evidence otherwise. The district court here, Judge Sparks, was the same judge that sat in the 441 case and heard this case, reviewed Mr. Stallman's statements to the Patent Office and concluded that Mr. Stallman was talking about the actual references that the examiner issued in his rejection and concluded that there were factually accurate statements that no reasonable juror could say otherwise. What Mr. Truesdale said in his opening was that, look, Mr. Stallman's statements were about the whole world of prior art. But what examiner would do that? What examiner would go to the Patent Office and say, look, you rejected my claims over four discrete references. What I'm going to do is take positions about the entire universe of prior art in every library in every country in the world. There's no reason to do that. You would never make statements about references that aren't the rejection and lie about them. And that's the context that Judge Sparks focused on. This is not a jury could go either way. And, in fact, this court has recognized limits on the ability to make inferences on ambiguous statements to allow fraud claims to go to the jury. And that's exactly what happened in the Lewis case that we cited in our brief. Moreover, in the opening brief, as I try to excite you. Lewis is a summary judgment case as to there's no evidence for the jury even to infer the following? The quote that I have, Your Honor, is this. A fraud claim should not be submitted to a jury unless the plaintiff has presented more than a mere scintilla of evidence. That's the summary judgment standard. A single ambiguous statement was insufficient to meet this minimum standard. If we look at the demonstrative that Mr. Truesdale provided and we go to page four of it, right, they're totally dependent on taking these statements out of context to try and create this reference that's totally improper. If you look at the bottom of page four, there's this highlighted sentence here that says particularly when the prior art relating to semiconductor samples teach different probe wavelengths. But what Mr. Stallman went on to say, as discussed above, the claim is patentable over Rosenzweig and Opsal. He's only talking about the references that the examiner identified to reject the claims. And then more importantly, with respect to causation, right, assuming the court wants to give the jury the benefit of the doubt that Mr. Stallman is an outlandishly aggressive examiner that makes statements that nobody would ever say, the causation problem in this record is insurmountable. Because let's look at this statement again and make it indisputably true. If Mr. Stallman had said particularly when the prior art cited by the examiner and relating to semiconductor samples teach different probe wavelengths, right, let's just indisputably narrow it to the art in front of, that the examiner found and issued the rejection over. Well, at that point, we've got a true statement and what would the PTO have done? Would the PTO, in the face of that true statement, gone back and revived Manzanaris and Batista and issued a new rejection? Absolutely not. We know what the PTO was going to do with Manzanaris and Batista. We have an allowance and a rejection over different art before any alleged misrepresentation or omission by Stallman. We know this examiner was not going to go back and come up with a new rejection if it were altered just a little bit to be indisputably true. The standard for fraud is that Mr. Stallman made a misrepresentation or omission of material fact that caused the PTO to do something that it wouldn't otherwise have done. And the PTO was not going to reject the claims over Manzanaris and Batista as demonstrated by this timeline. That was the basis of Judge Spark's causation holding. And this idea that the examiner's statements of allowance somehow points out reliance on what Mr. Stallman said about this wavelength. Again, what Zitronix is doing is trying to take excerpts out of context and get this court. Before your time runs out, I'm just looking at the Claim 9 in the 441 patent, Claim 1 in the 260 patent. Could you tell me the word in the 260 patent that is the most distinguishing feature? Is it the word fixed? That was the answer that I gave earlier. It was. But that's also you've acknowledged that Stallman never identified that ever in his communications to the examiner as the distinguishing feature. Is that correct? I agree. And there's no law or rule that suggests Mr. Stallman was under any obligation to do so. The examiner had before it both sets of claims. It did just because the time is running out. Did Stallman ever, communicating with Merrill, say, communicating with Merrill, say, and here's the jury verdict, we need to reconcile that verdict? And did he ever bring to the attention of Merrill in the latest sequence of exchanges the double patenting rejection? Can I see in the record in his communications reference to either of those? No, Your Honor. Neither Merrill nor Stallman revisits the prosecution, at least in their written record. But what we're dealing with here is an application to an administrative agency, and the PTO is who issues this patent. We have a record where one examiner concluded that the claims are not identical and allowed the claims over the very art that Mr. Truesdale focuses on. Then we have a second examiner who reviewed Judge Sparks' order from the 441 case. That can't be lost. Mr. Stallman does not have a duty of double disclosure. He doesn't have to say, here's the final judgment from the first case and here's my explanation of what that is. The Federal Circuit in C.R. Bard and Mullins has clearly said that there's no obligation on a patent prosecutor to explain the significance of the materials submitted to the Patent Office. This process is set up. Your time has expired. Thank you, Your Honor. What about that final remark? There's no duty of double disclosure. It's not a question of double disclosure, Your Honor. It's a question of complying with the duty of candor to identify for the to cease prosecuting a claim once a good faith basis to contend patentability expires. And the good faith duty, the good faith basis for claiming the patentability of the 260 patent, which is identical to the 441 patent, expired the day that the pellet deadlines ran. And this is very important. They note the fact that the patent, or that Mr. Stallman withdrew the allowance upon the entry of the final judgment upon its issuance, and they make him sound like that's some remarkable or heroic thing for him to have done. But the point is, is that he had to do that. And if he did do that, he's basically telling the PTO, we've got an adverse judgment. You know, he's preserving an ability to later claim that we're going to try to get this judgment reversed so that we would maintain a good faith basis to claim that the content of the patent is patentable. We're going to take it up on appeal. The PTO is not bound by a final judgment declaring a patent invalid until the pellet deadlines, all appeals have concluded, or no appeal was taken. But the PTO can look at promise or whatever and find out when the appeal does or doesn't materialize. Maybe shift, because your time is limited, to whatever you think is most important to correct. But I'd be especially interested in, they have now said the true, real distinguishing feature is that it was a fixed wavelength. And that point is, first of all, it's not discussed in any justification for treating the 260 any differently from the 441. It is admitted by Stallman that all of the wavelengths used historically and since inception have been fixed wavelengths. So it's a distinction without a difference. That's like saying a 2x4 made out of wood. Well, I mean, that's not a good one because you have metal studs. But my point is that that's an inherent component of the wavelengths that are being used. They are all fixed wavelengths. So that's not a distinction with any difference, even though the word is put in there. And cases like Ohio that we cite in our brief tell you that just the inclusion of a word or Nestle, both cited in our brief. What else would you want to correct as to his statements? Well, I would just tell you that the double patenting rejection, there are events that occurred before the rendition of the judgment with respect to an earlier examiner, and there were things that happened after the fact. But the point is, is that after the rendition of the judgment, when they lacked any good assertion of the patent as being valid. Now, the Batista and Manzanares, those references are important because any consideration of those came before Judge Sparks' ruling. And Judge Sparks' ruling spends pages talking about why Batista and Manzanares rendered the patent invalid. In fact, he says that it's such prior art that KLA cut and pasted the graph that was used in Batista and incorporated it into the 441 patent. Okay? So that has been a cornerstone of the demonstration of prior art that rendered the 441 invalid. And so to say that the new examiner could simply disregard Batista and Manzanares, the PTO should never have been put in a position where it was asked to do that because an administrative examiner does not have the authority to override a federal court judgment of invalidity. And that's precisely what this judgment did or what the issuance of the patent did. But if that's improper and that's what it sounds like, the Federal Circuit in the oral argument, you presumably both were in this. There's something seriously wrong here. They're overriding. But that doesn't necessarily go to fraud by Stallman. No. Your Honor, respectfully, I disagree. Okay. I think it is fundamentally a question of fraud because the examiner should have never been asked to do that. He had no — Stallman had an unwavering duty to terminate the prosecution upon the — upon losing the right to claim the fake cases. You do keep saying that. What's the best Federal Circuit case? I can tell you the best Federal Circuit case, and I can tell you the statutes. I can tell you the emphasis. Start with the best Federal Circuit case. Yes, Your Honor. Even giving them everything, you know, in the immense filing on 260, they still have committed fraud by pressing something that the examiner, if he dug enough, would find. Yeah. 10.85, which is cited in our brief, says that you may not knowingly advance a claim unwarranted under existing law without a good-faith basis to do so. Okay? And then 37 CFR 1118. I know those sites, but what's the case? Well, I would tell you that Beckman certainly says that. Blundertongue says that once the patent claim is invalid, it's unenforceable.  I know that. They can't pursue that anymore. But that's pursuant against others, not to the PTO. Well, I'd say that's — Your Honor, I'm sorry. You can finish your statement. Well, the consequences as between others and the PTO have got to be the same, because if not, then it completely undermines the concept of Blundertongue and the collateral estoppel consequences there, too. Thank you, Your Honor. Thank you, sir. Thank you.